

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | WD77257 |
| v. | ) | |
| | ) | OPINION FILED: |
| | ) | July 21, 2015 |
| AROOSTOOK METTE-NJULDNIR, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Callaway County, Missouri**
**The Honorable Kevin M.J. Crane, Judge**

**Before Special Division:** Lisa White Hardwick, Presiding Judge, and
Karen King Mitchell and Cynthia L. Martin, Judges

Aroostook Mette-Njuldnir appeals his conviction of second-degree assault, entered following a jury trial, for which he was sentenced to three years' imprisonment. Mette-Njuldnir raises two points on appeal: (1) the trial court erred in failing to hold a hearing to determine whether Mette-Njuldnir was competent to be tried and sentenced; and (2) the trial court erred in failing to sua sponte declare a mistrial because Mette-Njuldnir's testimony suggested that he lacked mental fitness. Because the record supported the trial court's determination that Mette-Njuldnir was competent to be tried and sentenced, we find no error and affirm.

**Background**

On August 25, 2009, Mette-Njuldnir was a patient at the Biggs Unit in Fulton State Hospital (FSH) in Callaway County. That afternoon, Mette-Njuldnir approached Alicia Simons (a social worker employed by FSH and a member of Mette-Njuldnir's treatment team) and punched her in the face and abdomen, causing three fractures to her eye socket, which later required surgery. The incident was captured on videotape, and Mette-Njuldnir later voluntarily wrote a detailed letter to the Chief Operating Officer of FSH explaining his conduct, noting that Simons "only received two of three punches thrown. Both medium paced. I'm getting old, I guess so, the third, career ender, missed. At 45ish, I'm guessing she may recover and even return to work."[1] As a result of his conduct, Mette-Njuldnir was charged on March 31, 2010, by information, with one count of second-degree assault.

Mette-Njuldnir had been a patient at FSH as a result of prior involuntary commitments, under § 552.020,[2] following criminal charges in both Buchanan and Jackson counties.[3] Accordingly, on May 10, 2010, Mette-Njuldnir's trial counsel filed a motion for an independent mental examination to determine whether Mette-Njuldnir possessed the capacity to understand the proceedings in Callaway County and assist in his own defense. The trial court granted the request, and Dr. Michael Armour, a certified forensic examiner for the Department of Mental Health (DMH), found that Mette-Njuldnir was afflicted with delusional disorder—persecutory

---

[1] Mette-Njuldnir testified that he intended to put Simons out of work for 5,000 days.

[2] All statutory citations are to the Revised Statutes of Missouri 2000, as updated through the 2008 Cumulative Supplement, unless otherwise noted.

[3] The parties referred to these commitments as being based upon findings of "permanent" incompetence. We find nothing in § 552.020 using this terminology. Presumably, the parties mean that, after the two permissible six-month commitment periods, Mette-Njuldnir was deemed unlikely to regain mental fitness anytime in the foreseeable future. But the record is very vague on the issue of his prior commitments. In any event, we see no basis in the law for a determination that an accused in a criminal action is "permanently" incompetent. Thus, we do not believe there is any conflict present in the fact that Mette-Njuldnir was ultimately declared competent in his Callaway County case.

2

type, which constituted a mental disease or defect under Missouri law, and that, as a result of his mental disease or defect, Mette-Njuldnir lacked mental fitness to proceed.[4] Dr. Armour opined that Mette-Njuldnir would not regain his mental fitness at anytime in the foreseeable future.

Trial counsel filed a "Notice of Contest to Findings of 552.020 Evaluation, Request for Hearing Pursuant to 552.020(7), Request that a Six[-]Person Jury be Impaneled, and Notice of Hearing." The notice specifically contested the following findings: (a) that Mette-Njuldnir suffered from delusions; (b) that Mette-Njuldnir had any mental health disorder; (c) that any alleged disorder constituted a mental disease or defect; (d) that Mette-Njuldnir lacked mental fitness to proceed; (e) that Mette-Njuldnir's ability to consult with counsel was impaired; (f) that Mette-Njuldnir required hospitalization for psychiatric treatment; and (g) various other facts and conclusions within the report. The notice sought a court determination that Mette-Njuldnir was, in fact, competent to stand trial.

At a subsequent pretrial hearing, trial counsel withdrew the notice—contrary to Mette-Njuldnir's wishes[5]—and asked the court to find Mette-Njuldnir incompetent to proceed, to

---

[4] Dr. Armour identified the following delusions held by Mette-Njuldnir:

He believes that he has been followed and monitored by the National Security Administration because of his inventing an energy mechanism that runs on gravity. He maintains that the Federal Protection Services agent who had delivered him to the Western Missouri Mental Health Center had lied about the allegations against him and that the Department of Mental Health has gone along with his different psychiatric commitments in order to protect the Federal Protective Services agent. Mr. Mette-Njuldnir then maintains that the Department of Mental Health works to keep him committed in order to protect itself because DMH had medicated him illegally. Mr. Mette-Njuldnir maintains that his public defender is working with the prosecutor and the Department of Mental Health to commit him to keep him from going to trial so that he cannot expose the wrongs done to him.

[5] Trial counsel advised the court that he believed Mette-Njuldnir incompetent to make a decision as to whether to contest Dr. Armour's findings and that counsel believed a hearing was not in Mette-Njuldnir's best interests. Counsel believed that, under Rule 4-1.14, he was entitled to make that decision on his client's behalf. Rule 4-1.14(b) provides:

When the lawyer reasonably believes that the client has diminished capacity; is at risk of substantial physical, financial or other harm unless action is taken; and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including

order him committed to DMH with a six-month review for competency, and to appoint a guardian for Mette-Njuldnir. The court later entered an order finding Mette-Njuldnir incompetent to proceed, suspending the proceedings against him, and committing him to the custody of DMH.[6]

Mette-Njuldnir was evaluated again pursuant to a six-month review, this time by Dr. Kline, a licensed psychologist for DMH. Like Dr. Armour, Dr. Kline diagnosed Mette-Njuldnir with delusional disorder. But unlike Dr. Armour, Dr. Kline concluded that Mette-Njuldnir was competent to proceed with his criminal case, though he opined that Mette-Njuldnir "could become psychiatrically unstable at some point in the future in the course of the proceedings."

In response to Dr. Kline's report, trial counsel filed a "Notice of Contest to Findings of 552.020 Evaluation, Request for Additional Examination, Request that Additional Examination be Audio or Videotaped, Request that Defendant be Allowed to Retain Audiotape or Videotape of Psychiatric Examination, and Notice of Hearing."[7] The trial court entered an order allowing the defense to proceed with an independent mental evaluation and allowing Mette-Njuldnir to record the interview. The court initially set the matter for a competency hearing on July 9, 2012,

---

consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a next friend, guardian ad litem, conservator or guardian.

Mette-Njuldnir, himself, advised the court that he disagreed with counsel's decision and that he believed it was improper for counsel to change strategic course without first consulting the client.

[6] This order does not appear in the record on appeal. The only reference to it is within a motion to proceed filed by DMH. This is a recurrent problem with the existing record in this case; many documents allegedly relied upon are not contained within it. We advise the trial court and attorneys below to take the necessary steps to ensure that all pleadings, motions, orders, and other papers are included within the record in future cases so as to avoid confusion.

[7] As with the court's order committing Mette-Njuldnir to DMH custody, trial counsel's "Notice of Contest" is not included within the record. Thus, we cannot discern which aspects of Dr. Kline's report trial counsel was contesting.

4

but Mette-Njuldnir's independent mental evaluation had not been completed by that date. Sometime in late August or early September of 2012, the evaluation was finally completed, and Dr. Petersen, the evaluating psychologist, found Mette-Njudnir competent to proceed.[8] Accordingly, trial counsel requested a trial setting. Mette-Njuldnir personally asked the court about a hearing and a six-person panel, and the court indicated that the hearing would occur only if Dr. Kline's findings were contested, and since Mette-Njuldnir's independent evaluator reached the same conclusions as Dr. Kline, there was no contest and no need for a hearing.

Mette-Njuldnir filed a pro se motion for a "fairness hearing," wherein he challenged trial counsel's decisions to withdraw the notice of contest to Dr. Armour's report and to not further challenge Dr. Kline's report with a written report from Dr. Petersen. In discussing the motion with the court, trial counsel represented that Mette-Njuldnir had no disagreement with Dr. Kline's ultimate conclusion that Mette-Njuldnir was competent; rather, he wished to challenge other findings within the report. Mette-Njuldnir also personally expressed concerns about proceeding without a written report from Dr. Petersen.

The case proceeded to jury trial, where Mette-Njuldnir presented a self-defense claim, arguing that his action of striking Simons was the result of mistreatment by DMH, including forced medication, separation from legal papers, and refusal to sign and date legal papers when provided to him, among other things. Mette-Njuldnir argued that he had taken all of the proper procedural steps to address his issues through DMH, but nothing was done and none of his problems were resolved; thus, he felt compelled to do something to stop the problems and defend himself from further psychological harm, so he punched Simons in an effort to preclude her from

---

[8] It appears that Dr. Petersen did not generate a report.

5

working at DMH and get her off his treatment team.[9]  Trial counsel requested that the jury be instructed on self-defense, but the court denied the request.  The jury found Mette-Njuldnir guilty of second-degree assault and recommended punishment of three years' imprisonment.

Before the sentencing hearing, the trial court ordered a fourth mental evaluation on its own motion.  The order indicated that the court had "reasonable cause to believe the accused lacks mental fitness to proceed."  Neither the transcript nor the order provides any information as to the basis for the court's belief.  This fourth examination was conducted by Dr. Kline.  Dr. Kline again diagnosed Mette-Njuldnir with delusional disorder and again found him to be competent, despite the diagnosis.  The report indicated that Mette-Njuldnir understood that his claim of self-defense lacked a legal basis under the existing law, but it was his hope and belief that he could persuade the jury to ignore the law in light of the circumstances of his case.  The report also opined that Mette-Njuldnir had been competent throughout his trial and remained competent for sentencing.

At the sentencing hearing, Mette-Njuldnir advised the court that he wished to contest Dr. Kline's findings, even though trial counsel did not.[10]  The court asked trial counsel to clarify, and trial counsel advised the court as follows:

> MR. CARVER:  Well, my understanding, Your Honor, if I can help explain that a little bit. Mr. Mette-Njuldnir agrees with the finding that he is competent. Mr. Mette-Njuldnir thinks he's competent.  He just disagrees about some of the particulars in the report and some of the statements made by Dr. Kline in reaching a conclusion.

---

[9] When the trial court questioned the defense strategy, Mette-Njuldnir responded, "Your Honor, what is wrong with a person defending themselves against people who are ganging up on him in an environment where the person cannot leave and they won't let him call the police?"

[10] No written motion was filed contesting or otherwise challenging Dr. Kline's pre-sentencing mental evaluation report.

When the court directly addressed Mette-Njuldnir regarding the basis for his contest, Mette-Njuldnir indicated:

> THE DEFENDANT: I'm contesting the findings of the report in general, Your Honor. The finding of competent, I have no problem with that. But I have a problem with other findings in the report, that detailed many things that Dr. Kline is actually wrong on, in terms of the medical establishment.
> He says his report is based on the DSM-IV. And yet it's not based on the DSM-IV, according to the findings that he has in that report. And I'd like to be able to bring that in front of a panel, to evaluate whether the report is actually legitimate.

The court found Mette-Njuldnir competent to proceed, and sentenced him in accordance with the jury's recommendation to three years' imprisonment. Mette-Njuldnir appeals.

## Analysis

Mette-Njuldnir raises two points on appeal, both related to his mental fitness below. First, he argues that the trial court erred in failing to hold a competency hearing. Second, he argues that the trial court erred in failing to sua sponte declare a mistrial because Mette-Njuldnir's testimony demonstrated that he lacked competence. We disagree and affirm.

### A. Procedural Requirements for Competence Determinations

"No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures." § 552.020.1.[11] "Whenever any judge has reasonable cause to believe that the accused lacks mental fitness to proceed, [the judge] shall . . . appoint one or more private psychiatrists or psychologists . . . to examine the accused." § 552.020.2. The examination "shall be completed and filed with the court within sixty days of the order unless the court for good cause orders otherwise." *Id*. "One pretrial

---

[11] All statutory references are to the Revised Statutes of Missouri 2000, as updated through the 2008 Cumulative Supplement, unless otherwise noted.

evaluation shall be provided at no charge to the defendant by the department [of mental health].

All costs of subsequent evaluations shall be assessed to the party requesting the evaluation." *Id*.

Each report generated as a result of an evaluation must contain the following:

(1) Detailed findings;

(2) An opinion as to whether the accused has a mental disease or defect;

(3) An opinion based upon a reasonable degree of medical or psychological certainty as to whether the accused, as a result of a mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own defense;

(4) A recommendation as to whether the accused should be held in custody in a suitable hospital facility for treatment pending determination, by the court, of mental fitness to proceed; and

(5) A recommendation as to whether the accused, if found by the court to be mentally fit to proceed, should be detained in such hospital facility pending further proceedings.

§ 552.020.3. After the report is filed, "both the defendant and the state shall, upon written request, be entitled to an order granting them an examination of the accused by a psychiatrist or psychologist . . . of their own choosing and at their own expense." § 552.020.6.

"If neither the state nor the accused nor his counsel requests a second examination relative to fitness to proceed or contests the findings of the [mental evaluation] report," the court has the discretion to either "make a determination and finding on the basis of the report filed or . . . hold a hearing on its own motion." § 552.020.7. If, however, the opinion is contested, "the court *shall* hold a hearing on the issue . . . of mental fitness to proceed and may impanel a jury of six persons to assist in making the determination." *Id*. (emphasis added). At the hearing, the party contesting the opinion has the rights to summon and cross-examine the person issuing the opinion and to offer evidence on the issue. *Id*. The accused is presumed competent, and the

8

challenging party bears the burden of proving otherwise under a preponderance-of-the-evidence standard. § 552.020.8.

If the court deems the accused mentally unfit to proceed, the court must suspend the criminal proceedings and commit the accused to the custody of DMH, where the accused will then be subject to a review of his competence after six months. § 552.020.9, .11(1). If the six-month review concludes that the accused remains mentally unfit to proceed, the report must contain an opinion "as to whether there is a substantial probability that the accused will attain the mental fitness to proceed in the foreseeable future." § 552.020.11(1). After the report is filed, both parties again have the option of seeking an additional examination at their own expense. § 552.020.11(2). "If neither the state nor the accused nor his counsel requests a second examination," the court again has the discretion to render a decision on the report alone or to hold a hearing on the matter. § 552.020.11(3). If the opinion is contested, however, the court is required to hold a hearing, with the same rights and burdens as identified in § 552.020.8. *Id*.

If the court determines that the accused lacks mental fitness to proceed, but that there is a substantial probability that the accused will attain mental fitness in the reasonably foreseeable future, the court may order one additional period of commitment lasting no more than six months. § 552.020.11(5). If, however, the court determines that the accused lacks mental fitness and there is no substantial probability that mental fitness will be attained in the reasonably foreseeable future, the court must dismiss the criminal charges without prejudice, "but only if proper proceedings have been filed under chapter 632 or chapter 475." § 552.020.11(6).

If the question regarding the accused's competence does not arise until after a jury is impaneled to determine guilt *and* "the court determines that the accused lacks the mental fitness

9

to proceed or orders the accused committed for an examination . . . , the court *may* declare a mistrial." § 552.020.12 (emphasis added).

## B. Standard of Review

"A trial court's finding that a defendant is competent to stand trial is a factual finding that will not be overturned unless there is no substantial evidence to support it." *State v. Wallace*, 399 S.W.3d 921, 923-24 (Mo. App. E.D. 2013). "We accept as true all evidence and reasonable inferences tending to support the trial court's findings." *Id.* at 924. "The accused has the burden to prove incompetence." *Id.*

Here, neither of Mette-Njuldnir's claims is preserved for review. As to his first claim, regarding the lack of a competency hearing, Mette-Njuldnir failed to include this claim of error in his motion for new trial. *See* Rule 29.11(d) ("In jury-tried cases, allegations of error to be preserved for appellate review must be included in a motion for new trial . . . ."); *see also State v. Kinder*, 942 S.W.2d 313, 323 (Mo. banc 1996) (finding the defendant's claim of error regarding the trial court's failure to hold a competency hearing not preserved where the defendant failed to raise the issue both at trial and in his motion for new trial). Thus, it is not preserved for review.

As to his second claim, regarding the court's failure to declare a mistrial, Mette-Njuldnir acknowledges that he never sought a mistrial below. Thus, this claim is not preserved either. *See State v. Burgess*, 800 S.W.2d 743, 746 (Mo. banc 1990) (holding that, in order to preserve a claim of error in the failure to grant a mistrial, a defendant must both request a mistrial when the alleged error occurs and raise the issue in the motion for new trial).

Because neither claim is preserved, we may review them for, at most, plain error. Rule 30.20 ("[P]lain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted

therefrom."). "In plain error review, we undertake a two-step process." *State v. Wilkerson*, 330 S.W.3d 851, 854 (Mo. App. W.D. 2011). "We first evaluate whether the trial court committed 'evident, obvious and clear error that affected substantial rights.'" *Id*. (quoting *Riddell v. Bell*, 262 S.W.3d 301, 304 (Mo. App. W.D. 2008)). "We then must determine whether such 'evident, obvious and clear error' created a manifest injustice or a miscarriage of justice." *Id*. (quoting *Riddell*, 262 S.W.3d at 304).

### C. The trial court did not err in failing to hold a competency hearing because Mette-Njuldnir did not "contest" any of the mental evaluation reports.

"The fact an examination has been ordered under § 552.020 does not automatically . . . require a court to sua sponte hold a hearing to determine such competency." *State v. Lee*, 660 S.W.2d 394, 397 (Mo. App. S.D. 1983). Rather, "a hearing on competency is required [only] when the psychiatric report is contested."[12] *State v. Mayfield*, 562 S.W.2d 404, 407 (Mo. App. 1978). And "there is no error in failing to have a competency hearing when a report is not 'contested.'" *State v. Vansandts*, 540 S.W.2d 192, 201 (Mo. App. 1976). "As the court has no alternative but to hold a hearing if a contest has in fact been made, the issue reduces itself here to whether the actions taken by [Mette-Njuldnir] constituted a contest." *State v. Grant*, 560 S.W.2d 384, 387-88 (Mo. App. 1977).

---

[12] *State v. Mayfield*, 562 S.W.2d 404, 407 (Mo. App. 1978), cited a second occasion purportedly requiring a hearing: "where the circumstances at a criminal trial create a 'bona fide doubt' of an accused's fitness to proceed." In making this assertion, the *Mayfield* court relied upon the United States Supreme Court's decision in *Pate v. Robinson*, 383 U.S. 375, 385 (1966). But the cited reference in the *Pate* decision was describing the requirements under Illinois law for dealing with mentally incompetent defendants; it did not mandate a competency *hearing* every time a court held a "bona fide doubt" regarding the accused's mental fitness. *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (In *Pate*, "[t]he Court did not hold that the procedure prescribed by Ill. Rev. Stat. c. 38, § 104-2 (1963), was constitutionally mandated, although central to its discussion was the conclusion that the statutory procedure, if followed, was constitutionally adequate."). Rather, as the Missouri Supreme Court pointed out in *Harkins v. State*, 494 S.W.2d 7, 14 (Mo. 1973), *Pate* requires a trial judge only "to *resolve* a pretrial question of competence . . . 'where the evidence raises a "bona fide doubt" as to a defendant's competence.'" (emphasis added) (quoting *Pate*, 383 U.S. at 385). It does not necessarily require a hearing in which to do so. And under § 552.020, a hearing is required only when a party contests the conclusion of the mental evaluation, a procedure that has been deemed constitutionally adequate by the United States Supreme Court. *Drope*, 420 U.S. at 173 ("Such a procedure is, on its face, constitutionally adequate to protect a defendant's right not to be tried while legally incompetent.").

"To 'contest' is '(t)o strive, to win or hold; to controvert, litigate, call in question, challenge . . . .'" *Id.* at 388 (quoting BLACK'S LAW DICTIONARY 391 (Revised 4th ed. 1968)). In order to "contest" a mental evaluation report, a party must first controvert the report's ultimate conclusion regarding mental competence by challenging "either the competency of the examiner or the validity of the procedures used." *Id.*; *see also* § 552.020.7, .8 (identifying the issue for determination in a competency hearing as "the mental fitness to proceed"). According to the plain language of § 552.020.7, a proper "contest" may come from either the state, *the accused*, or his counsel. Thus, we must evaluate the purported contests made not only by trial counsel but also by Mette-Njuldnir himself to discern whether any of them are truly "contests" under § 552.020.7 that required a hearing.

The record reflects four potential "contests": two from trial counsel and two from Mette-Njuldnir. The first "contest" was counsel's "Notice of Contest" in response to Dr. Armour's report opining that Mette-Njuldnir was incompetent to proceed. This contest specifically challenged not only Dr. Armour's conclusion of incompetence but also his findings that: (a) Mette-Njuldnir suffered from delusions; (b) Mette-Njuldnir had any mental health disorder; (c) any alleged disorder constituted a mental disease or defect; (d) Mette-Njuldnir's ability to consult with counsel was impaired; and (e) Mette-Njuldnir required hospitalization for psychiatric treatment. This "contest" was proper under § 552.020.7 and would have mandated a hearing. But it was withdrawn.[13] "Failure to contest a psychiatric report as allowed under § 552.020[.7] constitutes a waiver of that right." *State v. Caudill*, 789 S.W.2d 213, 214 (Mo. App. W.D. 1990). Accordingly, Mette-Njuldnir waived the right to a hearing on his contest to Dr. Armour's report.

---

[13] Mette-Njuldnir does not challenge counsel's decision to withdraw the contest against Mette-Njuldnir's wishes. And Mette-Njuldnir did not file any contests of his own regarding Dr. Armour's report.

The second "contest" filed by counsel was in response to Dr. Kline's report finding Mette-Njuldnir competent to proceed. This "contest," however, was not included in the record on appeal, which makes it difficult, at best, to discern the nature of the contest. Nevertheless, in light of the surrounding circumstances, we presume that, at a minimum, the contest challenged Dr. Kline's finding of competence. Unlike the first contest to Dr. Armour's report, the contest to Dr. Kline's report sought both to have an additional mental evaluation done at Mette-Njuldnir's expense and to have a hearing based upon the contest. Both requests were granted, but the hearing was never held because Mette-Njuldnir's evaluator, Dr. Petersen, concurred with Dr. Kline's assessment and also found Mette-Njuldnir competent. As the trial court explained, the purpose of Dr. Petersen's evaluation was to contest Dr. Kline's determination. But when Dr. Petersen concurred with, rather than contradicted, Dr. Kline's determination, there was no longer any challenge to Dr. Kline's assessment for which a hearing would have been required. Further, by requesting a trial setting rather than a competency hearing, Mette-Njuldnir waived his right to a hearing on the basis of his contest to Dr. Kline's report.

As for the two pro se "contests," the first potential contest was Mette-Njuldnir's "Motion for Fairness Hearing." This motion challenged trial counsel's decisions outlined above to both withdraw the contest to Dr. Armour's report and to proceed to trial without a report from Dr. Petersen in response to Dr. Kline's report. This motion, however, raised no direct challenges to either report insofar as the motion did not identify any flaws in either the competence of the examiners or their methodology for conducting the evaluations. Additionally, the only challenge Mette-Njuldnir had to Dr. Kline's report had nothing to do with the ultimate conclusion that Mette-Njuldnir was competent. On the contrary, Mette-Njuldnir wholeheartedly agreed with

13

Dr. Kline's conclusion in that regard. Thus, his "Motion for Fairness Hearing" did not constitute a contest under § 552.020.7, and no hearing was required.

The final pro se "contest" was the oral assertion made before sentencing by Mette-Njuldnir wherein he indicated that he wished to contest Dr. Kline's second, post-trial, mental evaluation report, even though trial counsel did not wish to do so. In making this "contest," Mette-Njuldnir stated:

> I'm contesting the findings of the report in general, Your Honor. *The finding of competent, I have no problem with that.* But I have a problem with other findings in the report, that detailed many things that Dr. Kline is actually wrong on, in terms of the medical establishment.
> He says his report is based on the DSM-IV. And yet it's not based on the DSM-IV, according to the findings that he has in that report. And I'd like to be able to bring that in front of a panel, to evaluate whether the report is actually legitimate.

Even though Mette-Njuldnir appeared to attack Dr. Kline's methodology, he had "no problem" with Dr. Kline's ultimate conclusion that Mette-Njuldnir was competent. Thus, this did not constitute a true "contest" under § 552.020.7. Accordingly, it did not entitle Mette-Njuldnir to a hearing.

In sum, an accused is entitled to a competency hearing under § 552.020 only if he contests a court-ordered mental evaluation report by challenging the ultimate conclusion regarding mental fitness through attacks on either the competence of the evaluator or the methodology used. Here, because Mette-Njuldnir either did not contest the ultimate findings of the reports or withdrew valid contests to the reports, he was not entitled to a hearing, and the trial court committed no error, plain or otherwise.

Point I is denied.

14

**D. The trial court did not err in failing to sua sponte declare a mistrial because the evidence before the court supported a determination that Mette-Njuldnir was competent.**

In his second point, Mette-Njuldnir claims that the trial court erred in failing to sua sponte declare a mistrial under § 552.020.12 due to Mette-Njuldnir's alleged lack of competence displayed during trial. We disagree.

Under § 552.020.12, "[i]f the question of the accused's mental fitness to proceed was raised after a jury was impaneled to try the issues raised by a plea of not guilty *and* the court determines that the accused lacks the mental fitness to proceed or orders the accused committed for an examination . . . , the court *may* declare a mistrial." (Emphasis added.)

Here, to the extent Mette-Njuldnir's mental fitness was called into question during trial, the trial court satisfied its concerns by ordering another mental evaluation before sentencing to determine the issue. That evaluation determined not only that Mette-Njuldnir was competent to proceed with sentencing but also that he had been competent throughout his trial. Accordingly, the court found that Mette-Njuldnir was mentally fit to proceed with sentencing. Because of this finding, Mette-Njuldnir has failed to demonstrate one of the prerequisites to the court's discretionary decision to grant a mistrial under § 552.020.12: that "the court determines that the accused lacks the mental fitness to proceed or orders the accused committed." The court did neither.

In any event, "'[a]ppellate courts are wary of claims that a trial court erred in failing to declare a mistrial *sua sponte* in a criminal case.'" *State v. Sprofera*, 427 S.W.3d 828, 837 (Mo. App. W.D. 2014) (quoting *State v. Hitchcock*, 329 S.W.3d 741, 749 (Mo. App. S.D. 2011)). "'Granting a mistrial is a drastic remedy and should be exercised only in extraordinary circumstances where the prejudice to the defendant cannot be removed any other way.'" *Id.*

15

(quoting *State v. Garvey*, 328 S.W.3d 408, 416 (Mo. App. E.D. 2010)). "'Trial judges are not expected to assist counsel in trying cases, and trial judges should act *sua sponte* only in exceptional circumstances.'" *Id.* (quoting *State v. Barker*, 410 S.W.3d 225, 235 (Mo. App. W.D. 2013)). "Thus, 'a trial court's decision not to grant a mistrial *sua sponte* will not be reversed as plain error absent a clear showing of a manifest abuse of discretion, which resulted in manifest injustice or a miscarriage of justice.'" *Id.* (quoting *Barker*, 410 S.W.3d at 235).

Here, there is no manifest injustice present. The trial court ordered four separate mental evaluations during the pendency of the case. Three of the four declared Mette-Njuldnir competent. The only evaluation declaring him incompetent was the very first evaluation, conducted over three years before the sentencing proceeding. Every evaluation after that declared him to be competent. Mette-Njuldnir, himself, asserted his competence, as did his trial counsel. Accordingly, the trial court did not commit plain error in not exercising its discretion to declare a mistrial on the basis of Mette-Njuldnir's alleged incompetence.[14]

Point II is denied.

---

[14] Mette-Njuldnir argues that his trial strategy and the court's decision to order a post-trial mental evaluation reflect the need for a mistrial. We disagree. First, Mette-Njuldnir identifies his trial strategy decisions of admitting the offense, denying remorse, and requesting the maximum sentence, as reflecting incompetence. But many of these decisions were consistent with his claim of self-defense; for that claim to be successful, he necessarily had to admit the offense and claim justification, which could easily involve a lack of remorse. A criminal defendant's "alleged mistakes in trial tactics [do] not demonstrate that [he] lacked understanding of the proceedings against him or that he was unable to assist in his defense." *State v. Wise*, 879 S.W.2d 494, 508-09 (Mo. banc 1994), *overruled on other grounds by Joy v. Morrison*, 254 S.W.3d 885 (Mo. banc 2008). And second, the court's decision to order a post-trial evaluation likewise has no bearing: "[t]he fact an examination has been ordered under § 552.020 does not automatically establish a bona fide doubt of the defendant's competency to stand trial." *State v. Lee*, 660 S.W.2d 394, 397 (Mo. App. S.D. 1983).

Mette-Njuldnir further argues that his multiple requests to end trial counsel's representation demonstrated an inability to consult with counsel. Were disagreement between an indigent criminal defendant and his appointed public defender, without more, a basis for a finding of incompetence, courts would be inundated with claims of allegedly incompetent defendants. The record here reflects that, despite their disagreements, Mette-Njuldnir and counsel were still able to communicate sufficiently to present a defense that, though unsuccessful in avoiding conviction, appeared successful in mitigating punishment.

## Conclusion

The trial court did not err, plainly or otherwise, in not granting Mette-Njuldnir a competency hearing or in not sua sponte declaring a mistrial due to Mette-Njuldnir's alleged incompetence. Mette-Njuldnir's conviction and sentence are affirmed.

_____
Karen King Mitchell, Judge

Lisa White Hardwick, Presiding Judge,
and Cynthia L. Martin, Judge, concur.